IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

UNITED STATES OF AMERICA,      §
                               §
                Plaintiff,     §
                               §  Criminal No. 3:08-CR-163-D
VS.                            §
                               §
                               §
BRANDON EUGENE GETACHEW,       §
                               §
                Defendant.     §

MEMORANDUM OPINION
AND ORDER

Defendant Brandon Eugene Getachew ("Getachew") moves to suppress a firearm (handgun) and all controlled substances seized from his residence during a search conducted pursuant to a warrant, contending that it is fruit of a prior unlawful search. For the reasons set forth below,[1] the court denies the motion.

I

On August 24, 2007, at approximately 4:07 a.m., a City of Desoto, Texas dispatcher dispatched Desoto police officer G. Kirkland ("Officer Kirkland") to a burglary in progress at Getachew's residence, a townhouse located at 1204 St. Moritz Court in Desoto. The dispatcher informed Officer Kirkland that several men wearing masks had broken into the townhouse. The dispatcher dispatched another Desoto patrol officer, Jermaine Brumfield ("Officer Brumfield"), to provide back up coverage. Officers

_____

[1]Pursuant to Fed. R. Crim. P. 12(d), the court sets forth in this memorandum opinion and order its essential findings.

Kirkland and Brumfield characterized the nature of the dispatches as being more like a robbery in progress than a burglary in progress. The emergency call reporting the burglary in progress was made by a neighbor at the request of Getachew's brother, Christopher Getachew ("Christopher"). Christopher had fled the townhouse by jumping from a second floor window upon seeing the intruders downstairs. He went to the home of the neighbor, who called the police.

Officer Kirkland was the first officer on the scene, arriving approximately three minutes after receiving the call from dispatch. He observed Getachew standing near the front door, which had been kicked in and had a damaged frame. Getachew's hands were bound in front of his body with plastic flex cuffs. He looked scared. Officer Kirkland did not know for certain whether Getachew was the crime perpetrator or the victim, although he was pretty sure Getachew was the victim. During a brief conversation, Getachew informed Officer Kirkland that several men had come into his residence with guns and tried to rob him. Although Getachew or Christopher told Officer Kirkland that he saw a gold car and a white car leave the scene, and the dispatcher relayed similar information to the officers, the police did not know if these were the same men who had robbed Getachew. They were possible suspects, and other officers were dispatched to look for them.

Officer Brumfield arrived almost immediately after Officer

Kirkland arrived (while Officer Kirkland was walking toward the townhouse).  Officer Brumfield approached Getachew's townhouse, observing that the front door had been kicked in and that a piece of door frame was lying on the floor.  Getachew was standing right in the doorway with his brother, Christopher, who was behind him. Officer Brumfield could also see that Getachew had been handcuffed. He felt that he was investigating a robbery, and he was concerned that robbers were still in the residence.  He was also concerned for the safety of Getachew, Christopher, and the officers.

Officers Kirkland and Brumfield then entered the townhouse for the purpose of conducting a protective sweep to ensure that none of the robbers remained in the residence.  Officer Brumfield began to clear the first floor, but he stopped when he saw a stairwell leading to a second floor because he did not feel safe proceeding alone.  Officer Kirkland positioned himself at the bottom of the staircase to ensure that no one came downstairs.  Officer Brumfield then cleared the downstairs, beginning on the right-hand side and ending on the left-hand, where the dining area and kitchen were located, separated by a half-wall.

Officer Kirkland observed that the downstairs was in disarray, and he could see into the kitchen, observing that there were open drawers and cabinets.  He smelled a strong stale smell, like musty, dirty mop water.

When Officer Brumfield entered the kitchen, he observed open

cabinets, a drawer that was fully open, and a drawer that was partially open. In the open drawer, in plain view, he observed marihuana detritus, including seeds and pieces of buds, a scale of the type normally used to weigh drugs, and baggies. Based on his experience with narcotics (he enters homes as a member of the SWAT team), this fit the characteristics of drug distribution. He also smelled a strong odor of marihuana.

In the partially opened drawer, Officer Brumfield observed sandwich baggies, which he knew were often used to distribute drugs, and videos. Officer Brumfield then opened the drawer fully, observing a handgun.

Corporal Robert Penwarden ("Corporal Penwarden") arrived at the townhouse within minutes of Officer Brumfield's arrival. As Corporal Penwarden approached to the residence, he could smell a strong odor of marihuana. When he entered the townhouse, Officer Brumfield was clearing the kitchen, Officer Kirkland was watching the stairwell, and Getachew and Christopher were sitting on the couch. Officer Brumfield relayed to Corporal Penwarden the information he had, and he advised him that they had not cleared the upstairs.

Corporal Penwarden asked Getachew and Christopher whether there was anyone else in the house, and they responded that they did not believe so. Corporal Penwarden wanted to make sure the location was secure and that no one else was in the townhouse.

This was to ensure the safety of the officers, Getachew, and Christopher.

Corporal Penwarden then initiated a sweep of the second floor. All three officers went upstairs, where there were three bedrooms, one of which was used as a weight room. Corporal Penwarden and Officer Brumfield checked the master bedroom (identified at the hearing as room 1). The other rooms (identified as rooms 2 and 3) were also quickly checked.

Corporal Penwarden and Officer Brumfield observed that the master bedroom was in disarray and appeared to have been ransacked. It looked like the bed had been lifted, there were clothes everywhere, and some drawers appeared to have been jumbled through. They observed a scale on the bed along with marihuana detritus. There was a strong odor of marihuana, especially as they drew nearer to the closet.

It took the officers a couple of minutes to clear the second floor. After clearing the upstairs, Officer Brumfield cleared the garage. Corporal Penwarden returned downstairs, cut the handcuffs off Getachew, and instructed everyone to immediately exit the townhouse, which they did. Corporal Penwarden ordered the townhouse cleared based on the presence of drug paraphernalia and because he believed there was more to the crime scene than just a robbery. The officers were in the townhouse for a total of between three and five minutes. During the protective sweep, the officers

did not seize any items.

Outside the townhouse, Officer Brumfield stood guard to ensure that no one entered. Corporal Penwarden and Officer Kirkland interviewed Getachew and Christoper. Corporal Penwarden asked Getachew for consent to search the townhouse, but he refused. Based on the strong odor of marihuana in the residence, the presence of marihuana seeds and drug paraphernalia, and Getachew's refusal to consent to a search of the residence, Corporal Penwarden contacted Detective William McGraw ("Detective McGraw") and relayed the information to him for the purpose of obtaining a search warrant.

Detective McGraw obtained a search warrant based on what Corporal Penwarden had relayed to him and the fact that Getachew's criminal history showed that he was a convicted felon. The application for the search warrant did not mention the handgun that Officer Brumfield had observed after pulling open the kitchen drawer.

After obtaining the warrant, Detective McGraw went to Getachew's townhouse, and officers searched the residence pursuant to the warrant. During the search, officers seized a number of items from the townhouse and garage, including scales, packaging baggies, a .25 caliber Lorcin handgun with magazine and bullets, a large baggie containing marihuana, and two large baggies containing crack cocaine.

Getachew was arrested and subsequently indicted on drug and weapons charges. In a superseding indictment, he is charged with the following offenses: possession with intent to distribute 50 grams or more of cocaine base, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(A); felon in possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2); and possession of a firearm in furtherance of the commission of a drug trafficking crime, in violation of 18 U.S.C. §§ 924(c)(1)(A).[2]

Getachew moves to suppress as trial evidence the handgun, marihuana, and crack cocaine. He maintains that this evidence must be suppressed because it is the fruit of an unlawful search. He contends that the Desoto police violated his constitutional rights by unlawfully entering his townhouse without a warrant and unlawfully sweeping his townhouse once inside. Getachew further contends that, because the officers unlawfully swept the townhouse, the items observed during the sweep cannot be relied upon to support the probable cause needed for a search warrant. Because the search warrant was issued based primarily on the items observed during the sweep, he argues that probable cause did not exist, and that the warrant is thus invalid.

---

[2]The indictment also includes a forfeiture count under 18 U.S.C. § 924(d) and 28 U.S.C. § 2461(c).

The court first considers whether the officers' warrantless entry into Getachew's townhouse violated his Fourth Amendment rights.

A

The Fourth Amendment protects individuals against unreasonable searches and seizures. "The touchstone of the Fourth Amendment is reasonableness." *Florida v. Jimeno*, 500 U.S. 248, 250 (1991). "Reasonableness, in turn, is measured in objective terms by examining the totality of the circumstances." *United States v. Powell*, 137 Fed. Appx. 701, 703-04 (5th Cir. 2005) (quoting *Ohio v. Robinette*, 519 U.S. 33, 39 (1996)).

"Warrantless entry into a home is presumptively unreasonable." *United States v. Maldonado*, 472 F.3d 388, 392 (5th Cir. 2006). A warrantless entry and search of a person's home can be justified, however, if the person consents or if probable cause and exigent circumstances exist. *See id.; United States v. Gomez-Moreno*, 479 F.3d 350, 354 (5th Cir. 2007). The government has the burden of establishing the existence of circumstances justifying warrantless entry. *Maldonado*, 472 F.3d at 393.

Probable cause exists if, under the totality of circumstances, there is a fair probability that contraband or evidence of a crime is inside or an illegal act is taking place. *United States v. Newman*, 472 F.3d 233, 236-37 (5th Cir. 2006). "There is no set

formula for determining when exigent circumstances justify a warrantless entry." *Maldonado*, 472 F.3d at 393 (citing *United States v. Blount*, 123 F.3d 831, 837 (5th Cir. 1997)). "Exigent circumstances generally exist where there is a risk that the officers or innocent bystanders will be endangered, or that evidence will be destroyed." *Blount*, 123 F.3d at 837; *see also United States v. Troop*, 514 F.3d 405, 409 (5th Cir. 2008) ("[L]aw enforcement officers may enter a home without a warrant in order to render emergency assistance to an injured occupant."). The court evaluates the circumstances as they "would appear to reasonable and prudent men standing in the shoes of the officers." *Maldonado*, 472 F.3d at 393 (quoting *United States v. Rodea*, 102 F.3d 1401, 1405 (5th Cir. 1996)). If reasonable minds could differ, the court should "not second-guess the judgment of experienced law enforcement officers concerning the risks of a particular situation." *Id.* (quoting *Blount*, 123 F.3d at 838).

B

The circumstances presented to Officers Kirkland and Brumfield and Corporal Penwarden justified their warrantless entry into Getachew's townhouse. First, there was probable cause to believe that an illegal act was taking place. Based on Christopher's account, relayed through a neighbor at his request, a police dispatcher informed the officers that a burglary was in progress at the residence, and that several men in masks had broken in. The

crime sounded to the responding officers more like a robbery in progress than a burglary.  Officers Kirkland and Brumfield arrived three minutes after being dispatched, and Corporal Penwarden arrived approximately two minutes thereafter.  As Officers Kirkland and Brumfield approached the townhouse, they observed that the front door had been kicked in and they saw two men near the door, one of whom had his hands bound in front of him with plastic handcuffs and looked scared.  Similarly, as Corporal Penwarden approached the townhouse, he observed that the door had been damaged.  Under these circumstances, the officers had probable cause to believe that the townhouse was the scene of a burglary or robbery. *See, e.g., United States v. Montemayor*, 2008 WL 268280, at *2 (N.D. Tex. Jan. 31, 2008) (Fish, J.) (holding that police had probable cause to believe burglary was underway when back door of house was open, there were signs of forced entry, and a car had recently sped away).

The apparent fact that the townhouse had been invaded by several masked men mere minutes before the officers' arrival constituted exigent circumstances to enter the residence.  The officers arrived within a few minutes of receiving reports that several masked men had broken into a residence.  When the officers arrived at the scene, they observed that the front door had been kicked in, and they encountered a man near the front door who was bound by handcuffs and looked scared.  All three officers were

concerned that the perpetrators of the robbery were still in the townhouse, and they were concerned for their own safety and for the safety of the apparent crime victims. Under these circumstances, a reasonably prudent man also would have believed that there was a risk of danger to himself and to the apparent victims. Because the officers reasonably believed that there was a risk of danger requiring immediate action, exigent circumstances existed that justified entry into the residence. *See Newman*, 472 F.3d at 237-38 ("Exigent circumstances existed if the agents' fear for their safety was reasonable.").

This finding is consistent with the holdings of this and other courts, which have held that "[a] perceived burglary has been found to create exigent circumstances justifying a warrantless entry." *Montemayor*, 2008 WL 268280, at *2 (citing *In re Sealed Case 96-3167*, 153 F.3d 759, 764-66 (D.C. Cir. 1998)); *see also United States v. Brown*, 449 F.3d 741, 748 (6th Cir. 2006) ("When probable cause exists to believe a burglary is in progress, officers are presented with exigent circumstances justifying their warrantless entry into the residence 'because [i]t would defy reason to suppose that [the officers] had to secure a warrant before investigating, leaving the putative burglars free to complete their crime unmolested.'" (quoting *United States v. Johnson*, 9 F.3d 506, 510 (6th Cir. 1993)) (alterations in original)).

Getachew argues that there were no exigent circumstances at

the time the officers entered the townhouse because they then knew that Getachew was the homeowner and that the robbers had already fled the scene.  The court disagrees.  The credible evidence does not support the contention that the officers knew when they entered the townhouse that *all* the robbers had already fled.  Although the dispatcher relayed that a gold car and a white car had been seen leaving the scene, there is no proof that the dispatcher or the officers knew for certain that these cars belonged to the intruders, or that *all* of the several masked men had fled the scene in these two cars.  Given the information the officers had and the short time frame in which they responded to the call for help, they could reasonably have believed that some suspects remained in the townhouse.  In response to the home invasion, Christopher fled from the townhouse to report a burglary in progress to his neighbor, who quickly called the police.  In turn, the police responded within minutes to the report of a crime in progress.  When they arrived, Getachew was still bound by handcuffs, and he looked scared.  Under these circumstances, the officers could reasonably have believed there were suspects remaining inside.

Getachew alleges that he informed the officers on their arrival that he knew no one else remained at the townhouse, and that Christopher also told them that he saw all the robbers flee.[3]

_____

[3]This allegation is inconsistent with the officers' testimony, and the court finds that the testimony on which it is based is not credible.  But even if Getachew had told the officers that no one

But Officer Brumfield testified that he did not engage in conversation with Getachew or Christopher. And although Officer Kirkland testified that Getachew or Christopher told him that a gold car and a white car had fled the scene, it does not necessarily follow that he knew no robbers remained. Corporal Penwarden testified that, when he arrived at the townhouse, he asked Getachew and Christopher whether anyone else was in the townhouse, and they gave the inconclusive reply that they did not believe so. All three officers testified that they were concerned for safety reasons that others were still in the townhouse.[4] Given how quickly all three officers responded to the reported crime in progress and the circumstances they encountered when they arrived (including a handcuffed man who looked scared), it was reasonable for the officers to suspect that someone posing danger remained inside.[5] The court finds the officers' testimony credible, and it concludes that exigent circumstances justified the officers' entry into the townhouse.

---

remained in the townhouse, the officers would not necessarily have been required under the circumstances to assume that the victim of a freshly committed home invasion was providing them reliable information that they were obligated to take at face value.

[4]The brevity and scope of their protective sweep support the finding that the officers were truly motivated by safety concerns in entering the townhouse.

[5]Furthermore, Getachew testified that he never told the officers not to come into the townhouse or to leave. In fact, he wanted and expected the officers to investigate the crime committed against him.

III

Getachew argues that even if the officers were justified in entering his townhouse, they were not justified in undertaking a protective sweep. He also contends that the officers overstepped the bounds of a valid protective sweep.

A

"The Fourth Amendment permits a properly limited protective sweep in conjunction with an in-home arrest when the searching officer possesses a reasonable belief based on specific and articulable facts that the area to be swept harbors an individual posing a danger to those on the arrest scene." *Maryland v. Buie*, 494 U.S. 325, 337 (1990). Protective sweeps can also be valid when not conducted incident to an arrest. *United States v. Gould*, 364 F.3d 578, 581 (5th Cir. 2004). The following requirements apply:

> First, the police must have entered legally and for a legitimate law enforcement purpose. Second, the officers must have a reasonable, articulable suspicion that the area to be swept contains a person posing a danger to those on the scene. Third, the protective sweep must be limited to a cursory inspection of only those spaces where a person may hide; it is not a full search of the premises. [Fourth,] officers must conclude the sweep once they have dispelled their reasonable suspicion of danger, and they may not continue the sweep after they are no longer justified in remaining on the premises.

*United States v. Mata*, 517 F.3d 279, 286 (5th Cir. 2008) (footnotes omitted) (citing *Gould*, 364 F.3d at 587).

- 14 -

As discussed above, the officers' warrantless entry into Getachew's townhouse was supported by probable cause and exigent circumstances. Thus they entered the residence legally and for a legitimate law enforcement purpose. The court has already found that the officers entered the townhouse because they were concerned that robbers who posed a risk to the officers and the apparent victims were in the residence. This belief also led the officers to undertake the protective sweep of the townhouse. The officers' apprehension that the townhouse still harbored someone who posed a danger is reasonable under the circumstances. They were informed by the dispatcher that several masked men had broken into the residence, and they arrived minutes later to find the front door kicked in and an apparent victim in handcuffs. The officers immediately undertook a protective sweep, and there is no indication that they swept the townhouse for another purpose. They were looking for robbers hiding in the house, not for contraband.

The court next considers whether the protective sweep was limited to a cursory inspection of only those spaces where a person could hide. With the exception of Officer Brumfield's pulling out a partially open drawer in the kitchen, which the court addresses

more fully below, the sweep was properly limited.[6]  The officers quickly cleared the rooms both downstairs and upstairs to ensure that the robbers were not hiding in the residence.  It took Officer Brumfield approximately one minute to sweep the first floor of the townhouse.  Getachew questions whether it was necessary for Officer Brumfield to sweep the kitchen,[7] because it is separated from the living area by a counter instead of a full wall, and one can see into the kitchen from the living area.  One cannot see the entire kitchen from the living area, however, and it is certainly possible that an intruder could hide behind the counter.  Furthermore, the kitchen's proximity to the front door supports the reasonableness of sweeping it.  The sweep of the second floor of the townhouse was also proper because the officers undertook a cursory inspection of the three rooms, looking only in places where an intruder could hide.

---

[6]Although the government cannot justify the search of the drawer under the protective sweep doctrine, Officer Brumfield's search of the partially open kitchen drawer does not invalidate the entire protective sweep.  The rest of the sweep was properly limited.  In some cases an unlawful search may call into question the true motivation of the police and indicate that they were not actually on a protective sweep but were searching for contraband.  This is not one of those cases.  The officers' actions and testimony support the finding that they were sweeping the townhouse in search of the intruders.

[7]Getachew testified during the hearing, however, that it was reasonable for an officer to walk into the kitchen to see if someone was there.

Finally, the officers concluded their sweep as soon as they had cleared all the rooms and dispelled their reasonable suspicion that someone posing danger remained in the residence.  In fact, as soon as they finished sweeping the second floor, Corporal Penwarden ordered everyone to leave the townhouse.  The officers were in the townhouse between approximately three and five minutes.  The officers' protective sweep was reasonable under the totality of the circumstances and met the requirements set forth by Fifth Circuit doctrine.  *See id*.

IV

Because the officers were justified in undertaking the protective sweep, their observations of all items in plain view were lawful.

A

Under the plain view doctrine, officers may seize items in plain view without a search warrant.  *See Horton v. California*, 496 U.S. 128, 136 (1990).  A warrantless seizure under the plain view doctrine is permissible if: "(1) the police lawfully entered the area where the item was located; (2) the item was in plain view; (3) the incriminating nature of the item was immediately apparent; and (4) the police had a lawful right of access to the item." *United States v. Virgil*, 444 F.3d 447, 451 (5th Cir. 2006) (internal quotation marks omitted).

Officer Brumfield observed a scale, baggies, and marihuana detritus in plain view in the kitchen. All of these items were observed in drawers that were open when Officer Brumfield entered the kitchen, and their incriminating nature was immediately apparent to him. Officer Brumfield also smelled a strong odor of marihuana in the kitchen. When sweeping the master bedroom on the second floor of the townhouse, Officer Brumfield and Corporal Penwarden again encountered a strong odor of marihuana. They also observed another scale and marihuana detritus in plain view on the bed. Under the plain view doctrine the officers would have been justified in seizing these items. The officers did not immediately seize them, however, but took the extra precaution of leaving the residence and obtaining a search warrant. *See United States v. Charles*, 469 F.3d 402, 406 n.2 (5th Cir. 2006) ("We note that although [t]he seizure of obviously incriminating evidence found during a protective sweep is constitutionally permissible pursuant to the plain view doctrine, the arresting officers in this case took the additional precaution of sealing the scene and obtaining a search warrant before removing any evidence." (citation and internal quotation marks omitted)). Subsequently, the police seized these items pursuant to the search warrant. All of these items were lawfully observed in plain view during the protective sweep, and were also lawfully seized under the warrant.

As indicated above, however, the handgun was not observed in plain view during the protective sweep. While observing the baggies in a partially open drawer in the kitchen, Officer Brumfield fully opened the drawer, revealing a handgun. This exceeded the scope of a proper protective sweep, and thus constitutes an unlawful search of the drawer.[8] Therefore, a warrantless seizure of the handgun would not have been justified under the plain view doctrine. The handgun was not seized at this time, however, and, as discussed below, it is admissible under the independent source exception to the exclusionary rule.

V

Getachew contends that the police lacked probable cause for a search warrant because all of the observations upon which the warrant was based were made during an unlawful search. The court concludes, however, that the observations upon which the warrant was based were not made during an unlawful search and that there was probable cause for the search warrant. The application for the search warrant was based primarily on the officers' observations of the scales, the marihuana detritus, and the strong odor of marihuana. All of these observations were lawfully made, and they

---

[8]It could be argued that because Officer Brumfield could have lawfully seized the baggies that were in plain view, he was justified in opening the drawer. The government has not made this argument, however, and, in light of the court's conclusion, it need not now consider it.

support a finding of probable cause.

Because the search warrant was valid, the items seized during the search are not the fruits of an unlawful search, as Getachew contends, and should not be suppressed. This admissible evidence includes the marihuana and crack cocaine, as well as the handgun.

Although the handgun was initially discovered during an unlawful search, it is admissible through the independent source exception to the exclusionary rule. "The independent source exception allows the 'introduction of unlawfully discovered evidence when the police have acquired that evidence through a distinct, untainted source.'" *United States v. Zavala*, 541 F.3d 562, 577-78 (5th Cir. 2008) (quoting *United States v. Grosenheider*, 200 F.3d 321, 327 (5th Cir. 2000)). "Animating this doctrine is the recognition that the goal of the exclusionary rule is to put the police in the same, not a worse, position that they would have been in if no police error or misconduct had occurred." *Id.* at 578 (quoting *Grosenheider*, 200 F.3d at 327) (internal quotation marks omitted). "[T]he government must make two showings in order for a lawful search pursuant to a warrant to be deemed 'genuinely independent' of a prior illegal search: (1) that the police would still have sought a warrant in the absence of the illegal search; and (2) that the warrant would still have been issued (i.e., that there would still have been probable cause to support the warrant) if the supporting affidavit had not contained information stemming

from the illegal search." *United States v. Runyan*, 290 F.3d 223, 235 (5th Cir. 2002). Both of these requirements have been met as to the handgun. First, the police would still have sought a search warrant if Officer Brumfield had not unlawfully observed the handgun in the drawer. Corporal Penwarden sought a search warrant because he suspected that the robbery of the townhouse was drug-related and that the townhouse was the site of drug trafficking. Neither his suspicion nor his motivation relied on the discovery of the handgun. Second, the handgun was not even mentioned in the application for the warrant, and there is no indication that the handgun served as a part of the probable cause showing.[9] Thus the warrant would still have been issued absent the discovery of the handgun. Because the handgun was seized pursuant to an independent and valid search warrant, Getachew is not entitled to suppress it.[10]

---

[9]Getachew appears to recognize this. *See* Mot. Suppress 12 (noting that search warrant was issued primarily on basis of marihuana detritus and drug paraphernalia, and stating that "tellingly, the firearm was not included in the search warrant").

[10]The handgun was covered under the warrant, which provided for the seizure of, *inter alia*, "[a]ny and all evidence relating to the sale and distribution of marihuana and other controlled substances." Even if the handgun was not covered under the warrant, its seizure would have been lawful under the plain view doctrine. The handgun was seized by police lawfully executing a search warrant. The police lawfully searched and seized baggies from the same drawer where the handgun was found. The incriminating nature of the handgun, especially when found alongside drug paraphernalia, would have been immediately apparent to the police, who knew prior to the execution of the search warrant that Getachew was a convicted felon.

*     *     *

Because the handgun and the controlled substances were seized pursuant to a valid search warrant, the court denies Getachew's October 10, 2008 motion to suppress.

**SO ORDERED.**

January 29, 2009.

_____
SIDNEY A. FITZWATER
CHIEF JUDGE